IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



ESTATE OF RICHARD DAVID
RAMIREZ, by and through Personal
Representative Julio Ramirez;
RICHARD JORDAN RAMIREZ, by
and through Conservator Julio
Ramirez; and JULIO RAMIREZ;

Plaintiffs,

vs.

CITY OF BILLINGS, a municipal
corporation of the State of Montana;
OFFICER GRANT MORRISON;
CHIEF RICH ST. JOHN; JOHN DOES
1–10; and CORPORATIONS A–J;

Defendants.

CV 17–52–BLG–DWM

OPINION & ORDER

On the night of April 14, 2014, Officer Grant Morrison of the Billings Police

Department shot and killed Richard Ramirez after pulling over the vehicle in

which Ramirez was a passenger. The ostensible reason to stop the driver, not

Ramirez, was a burned out license plate light. Officer Morrison killed Ramirez

when he refused to raise his hands simultaneously. Ramirez's estate, his father

Julio Ramirez, and his son Richard Jordan Ramirez ("Plaintiffs") sued Morrison,

Billings Police Chief Rich St. John, and the City of Billings under 42 U.S.C.

§ 1983, claiming the shooting was an excessive use of force in violation of

1

Ramirez's Fourth and Fourteenth Amendment rights. They also brought state negligence, survivorship, wrongful death, and assault claims. The defendants subsequently filed motions for summary judgment. (Docs. 21, 45.) Oral argument was heard on the motions on January 9, 2019. Morrison's motion for summary judgment is denied in part and reserved in part as to the § 1983 claims and granted as to the state law claims. The City and St. John's joint motion is granted as to the § 1983 claims and denied in part and granted in part as to the state law claims.

## BACKGROUND[1]

On April 13, 2014, Officer Marc Snider responded to reports of a robbery during which a person had been shot. Upon arriving, he learned Michael Chavez was the victim. Chavez told Snider he had been shot by a Richard Ramirez, who he claimed to have known for a long time. Officers found three syringes, bags of pills, and what they believed to be methamphetamine. Snider believed Chavez had a large amount of cash at the time of the shooting and found a cell phone with text messages from people who appeared to want to buy drugs. Snider theorized the shooting was drug-related and may have been a drug rip off.

---

[1] The facts are those stipulated to by the parties, (Doc. 12), those provided in support of the summary judgment motions, (Docs. 23, 29, 47, and 60), and those taken from dashboard camera footage of the incident from Morrison's patrol car, (Docs. 24 and 31, conventionally filed). The facts are undisputed unless otherwise indicated. Disputed facts are construed in favor of the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam).

Officer Grant Morrison arrived at the scene 10 or 15 minutes after the shooting was reported. He heard two people on the radio identify Ramirez as the suspect. Morrison was familiar with Ramirez. In the past, he had been called to the home of Ramirez's parents, Julio and Betty, to assist them in removing Ramirez. On the night of the Chavez shooting, Morrison and Officer Tony Jensen went to Julio and Betty's home to look for Ramirez, but he was not there. Morrison told them Ramirez was a suspect in a shooting.

The next night, April 14, 2014, Morrison began his shift at 9:00 p.m. At the shift briefing, Morrison learned the Chavez shooting was likely drug-related. He also learned of an "attempt to locate" out on Ramirez and that Ramirez may be armed and dangerous. No arrest warrant had been issued for Ramirez. Whether Morrison was instructed to treat Ramirez as armed and dangerous or whether officers merely surmised he might be armed and dangerous is in dispute.

Later in his shift, Morrison was travelling southbound on South 34th Street in an area of Billings commonly called "Southside" when he saw a red Ford Focus traveling westbound on 6th Avenue South. Morrison claims the vehicle made a quick right turn when the driver saw his patrol car, after which he began following it. Plaintiffs claim Morrison followed the vehicle because he knew Ramirez was a passenger. After following the vehicle for approximately one minute and forty seconds, Morrison initiated a traffic stop. He claims the vehicle's license plate was

3

not illuminated as required by Montana law.[2] Plaintiffs dispute the violation. The video from Morrison's squad car is unclear about the light.

As Morrison's patrol lights went on, the passenger in the rear passenger seat, Ramirez, turned to look at Morrison and shifted his body. Morrison approached the rear passenger door and said, "Hands up. All four of you hands up," to the four people in the vehicle. Ramirez raised his hands. Then Morrison opened the rear passenger door and said to Ramirez, "What were you doing? Why were you moving your hands around so much? You're making me nervous, man." Then he asked, "Who are you?" To which Ramirez replied, "Richard." As Ramirez said this, his left hand dropped out of view of the dashboard camera.

Morrison responded, "Richard? All of you put your fucking hands up right now on top of the seats." Ramirez placed his hands on the seat in front of him, then dropped them out of the camera's view again. Morrison radioed dispatch that he had Richard Ramirez and asked backup to "step it up." At this point, Ramirez's hands were out of the camera's view again. Morrison yelled, "Hands up. Hands on the fucking . . . . Get your fucking hands up or I'm going to shoot you." As he said the last part, he pulled his gun from its holster and aimed it at Ramirez. He

---

[2] The video shows that while Morrison trailed the vehicle, the driver obeyed all traffic regulations, including stopping at stop signs and using turn signals. The only rationale for the stop is the purported lighting violation, which, as Morrison concedes, is not evident from the video.

4

took a step back and said again, "I will shoot you. Hands up," then fired three shots. He continued to yell "Hands up" and warned twice that he would shoot again. He commanded Ramirez to get on the ground, which Ramirez, who was mortally wounded, was unable to do. Backup arrived.

Less than forty-three seconds elapsed from the time Morrison turned on his patrol lights until he shot Ramirez. In that time, Morrison first ordered—then screamed at—Ramirez and the others to put their hands up, seven times. Three seconds elapsed from the time Morrison first said "I'm going to shoot you" until he pulled the trigger. All three shots hit Ramirez—one penetrated his right shoulder, one entered his chest, and one grazed his wrists. Ramirez was unarmed and no weapon was found in the vehicle. Officers found a syringe on the floor and two baggies, one containing methamphetamine, near Ramirez's seatbelt buckle. A toxicology report showed Ramirez had methamphetamine and amphetamine in his system when he died.

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show the absence of any genuine dispute of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). The burden then

5

shifts to the nonmoving party to produce specific facts that show a material issue remains to be tried. *Id.* at 1103. A nonmoving party with the burden at trial must produce enough evidence to establish the essential elements of its claims. *Id.* A court must view all the evidence and draw all justifiable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must not weigh the evidence or make credibility determinations. *Id.*

ANALYSIS

## I. Summary judgment record

Rule 56(c) requires parties to support their factual assertions at summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The cited material does not have to be in an admissible form, but it must be capable of being presented in an admissible form at trial. Fed. R. Civ. P. 56(c)(2); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). When parties fail to comply with Rule 56(c), the court may "give an opportunity to properly support or address the fact." Fed. R. Civ. P. 56(e)(1). The option recognizes that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion, much less when an attempted response

fails to comply with Rule 56(c) requirements." Fed. R. Civ. P. 56(e) advisory committee's note to 2010 amendment.

In support of his motion for summary judgment, Morrison submitted his own affidavit, along with a map of his vehicle and the Ford Focus's routes; an affidavit from Officer Marc Snider, who investigated the Chavez shooting; an affidavit from Dr. Thomas Bennett, who conducted Ramirez's autopsy, along with the autopsy report; an affidavit from chemist Stacey L. Wilson, who conducted the forensic analysis of the baggies found in the vehicle, along with the chemical analysis report; an affidavit from toxicologist Scott Schlueter, who tested Ramirez's blood sample for drugs and alcohol, along with the toxicology report; and an affidavit from Detective Brett Kruger, who investigated the Ramirez shooting, along with the dashboard video from Morrison's patrol car and photos of the baggies and syringe found in the Ford Focus. In support of their motion, the City and St. John relied on Morrison's submissions and further submitted reports from their police practices expert Frank Garner and an affidavit from forensic video and audio expert Edward Primeau, who performed a forensic enhancement of the dashboard camera video, along with still photos from the enhanced video.

In opposition to the motions, Plaintiffs submitted a longer version of Morrison's dashboard video; the report of their police practices expert Ernie Burwell; the transcript of Burwell's deposition; the transcript of St. John's

7

deposition; excerpts of the City's discovery responses; and 309 pages of the Billings Police Department Policy Manual. Curiously, no party submitted police reports or records from the night of the shooting. Burwell's expert report summarized statements that eyewitnesses to the shooting made to Plaintiffs' investigator. Plaintiffs rely on the purported witness statements, but the summaries in Burwell's report are unsworn hearsay and cannot form part of the summary judgment record. *See Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 2015) (unsworn hearsay statements cannot be properly considered in opposition to summary judgment). Additionally, Plaintiffs failed to cite "to particular parts" of the 309-page policy manual as required by Rule 56(c).

On December 18, 2018, the Court exercised its discretion under Rule 56(e)(1) to allow Plaintiffs an opportunity to comply with Rule 56(c). (Doc. 64.) The Court ordered them to produce witness statements and a list of specific policies on which they rely by January 7, 2019. (*Id.*) Further, in light of its duty to "carefully examine all the evidence," *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), the Court ordered Morrison to file the full coroner's inquest transcript, which had already been submitted in part in response to Plaintiffs' motion in limine. (*Id.*)

In response to the December 18, 2018 Order, Morrison filed the coroner's inquest transcript and accompanying exhibits. (Doc. 65.) Plaintiffs filed

declarations from Dustin Halverson, the driver of the Ford Focus, and Crystal Jones, the front passenger. (Docs. 68, 69.) The declarations incorporated the notes of Plaintiffs' investigator, Mark Fullerton, and acknowledged that Halverson and Jones would testify consistent with Fullerton's notes. Plaintiffs also filed a declaration from Fullerton, which incorporated his notes on conversations with Halverson, Jones, and Tommy Black, who sat next to Ramirez in the backseat. (Doc. 70.) Additionally, Plaintiffs filed a declaration from attorney J.R. Casillas with a transcript of the police interview of Tommy Black the night of the shooting. (Doc. 73.) Finally, Plaintiffs filed an 11-page brief regarding the policies on which they rely for their claims against the City and St. John. (Doc. 74.) At oral argument, the Court struck the briefing portion of the filing, so that only the list of policies remains in the record, consistent with the December 18, 2018 Order.

The coroner's inquest transcript consists of sworn testimony. Any of the witnesses could be called at trial to present the same testimony. The transcript, then, can be considered at summary judgment. Halverson and Jones's declarations are sworn statements regarding what they would testify to at trial. Halverson and Jones have adopted Fullerton's notes as their own statements, eliminating hearsay concerns. Accordingly, Halverson and Jones's declarations are properly part of the summary judgment record. However, Black's statements to Fullerton, attached to Fullerton's declaration, and Black's interview with the police, attached to

9

Casillas's declaration, are unsworn hearsay and cannot be considered at summary judgment.

## II.    Officer Morrison's Motion for Summary Judgment

Morrison's motion is denied in part and reserved in part as to the § 1983 excessive force claim and granted as to the state law claims. As to the traffic stop, his motion is denied as moot.

### A.    Traffic stop

Morrison moves for summary judgment on Plaintiffs' claim that the traffic stop was unconstitutional. The Complaint is ambiguous as to whether Plaintiffs made a claim based on the traffic stop. The factual allegations assert the "stop of the vehicle was unconstitutional." (Compl., Doc. 3 at ¶ 17.) Further, Count 1 alleges Morrison violated Ramirez's "right to be free from unreasonable search and seizure," (*id.* at ¶ 35), which could encompass the traffic stop and/or use of force. However, Plaintiffs' response to Morrison's motion ignores the traffic stop and focuses only on the excessive force claim. More importantly, at oral argument Plaintiffs conceded they have no freestanding claim based on the traffic stop's constitutionality. Rather, they argue whether Morrison observed a lighting violation, as he claims, or stopped the vehicle absent a violation, and thus without reasonable suspicion, bears on his credibility with respect to the use of force claim. Because Plaintiffs are not pursuing an independent claim on these grounds,

Morrison's motion for summary judgment on the constitutionality of the traffic stop is moot.

## B.    Excessive force

Officer Morrison asserts qualified immunity as a defense to the excessive force claim. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The qualified immunity analysis has two-prongs: (1) whether the official violated a constitutional right, and (2) whether the right was clearly established. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam). Courts have discretion to address either prong of the qualified immunity analysis first. *Pearson*, 555 U.S. at 236. In some cases, "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237. In other cases, it "may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Id.* at 236 (citation omitted). This case falls into the latter category. Accordingly, the following analysis considers first whether Morrison violated Ramirez's constitutional right, then whether the right was clearly established.

### 1. Constitutional violation

A material dispute of fact exists as to whether Morrison's use of deadly force violated Ramirez's constitutional rights. The use of force to apprehend a suspect is a seizure subject to the Fourth Amendment's reasonableness requirement. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The test is whether the use of force was objectively reasonable based on the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). It is a fact-specific inquiry that balances the "nature and quality of the intrusion" against the "importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8 (internal quotation marks omitted). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Reasonableness is judged on the facts the officer knew at the time, considering that "officers are often forced to make split-second judgments." *Id.* at 396–97. At the same time, because the decedent cannot rebut the officer's version of events, courts should scrutinize the record rather than "simply accept what may be a self-serving account by the police officer." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (internal quotation marks omitted). "The judge must carefully examine all the evidence in the record, such as medical reports,

contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott*, 39 F.3d at 915. Given the fact-bound nature of the inquiry, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Glenn v. Wash. Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal quotation marks omitted).

### a. Severity of the crime

With respect to the first *Graham* factor, the severity of the crime at issue, Morrison argues Ramirez was suspected of having shot Michael Chavez the previous night during an armed robbery or drug deal gone bad. Plaintiffs respond that being a suspect in a violent crime does not by itself justify the use of deadly force. They cite a series of cases in which the victims had previously committed violent crimes yet deadly force was unreasonable. Plaintiffs are correct that no single factor is dispositive. And, while drug-related shootings are serious crimes, the severity is tempered here by the time elapsed, the lack of certainty that Ramirez was the Chavez shooter, and that the crime at issue the night of the police shooting was merely a traffic stop—an arguably pretextual stop of the car in which Ramirez was a backseat passenger.

When Morrison shot Ramirez, nearly 24 hours had passed since the Chavez

13

shooting was first reported and no warrant or charges were pending against Ramirez. The immediacy of any threat the alleged shooter posed had long passed, diminishing the severity of the suspected crime's relevance to the reasonableness analysis. Next, Ramirez was merely a person of interest in the Chavez shooting. The night of the Chavez shooting, Morrison visited the Ramirez household and informed Betty and Julio, Ramirez's parents, that Richard Ramirez was a suspect. He told them, "I don't know if it's the same Richard Ramirez or not." (Doc. 65, Ex. 4.) A member of the Ramirez family commented on having a brother named Richard Ramirez. (*Id.*) Morrison agreed that "it's a pretty common name." (*Id.*) At the coroner's inquest, Morrison expressed surprise at Ramirez having been named a suspect in the Chavez shooting and testified, "I've never known him to shoot somebody before." (Doc. 65-2 at 51.) Morrison's uncertainty at Ramirez being the Chavez shooter further diminishes the place of the severity of the crime in the reasonableness analysis.

At oral argument, the parties acknowledged that the Billings Police Department did not issue an arrest warrant for Ramirez after the Chavez shooting. Rather, as Morrison explains in his affidavit, the Department issued an "attempt to locate." (Doc. 23-1 at 5.) Further, at the coroner's inquest Officer Matt Brewer described the shift briefing on April 14, 2014, the night after the Chavez shooting. He explained "within that briefing was a request that if we located Richard

14

Ramirez, that we needed to speak to him in regards to this shooting that occurred the night before." (Doc. 65-1 at 54.) The Department's own response to Ramirez's alleged involvement in the Chavez shooting—failing to issue an arrest warrant and merely putting out an "attempt to locate"—suggests it did not treat him as a dangerous criminal, further mitigating the severity of the crime's importance in the reasonableness analysis.

Finally, apart from being out late in a high-crime neighborhood, before the traffic stop Ramirez had done nothing to suggest he was engaged in criminal conduct the night he was killed. Morrison initiated the traffic stop ostensibly because the vehicle's license plate was not illuminated. Plaintiffs dispute the lighting violation and Morrison concedes the dashboard camera video is inconclusive as to whether the light was operating. Even so, an alleged lighting violation can hardly be described as "severe," and would be attributed to the vehicle's driver, rather than Ramirez. Though traffic stops can be dangerous for officers, for purposes of analyzing the severity of the crime at issue, the alleged lighting violation weighs against Morrison and arguably suggests a pretextual stop.

### b. Immediate threat to safety

The most significant *Graham* factor is whether Ramirez posed an immediate threat to the safety of the officer or others when he was seated in the backseat of a car stopped for a vehicle condition violation. See *Mattos v. Agarano*, 661 F.3d

15

433, 441 (9th Cir. 2011) (en banc). Morrison argues Ramirez moved his left hand toward his waist, as if reaching for the gun he used to shoot Chavez. But when viewing the facts in the light most favorable to Plaintiffs, a material dispute exists as to whether Ramirez was reaching for his waist or otherwise moving in a threatening manner, or if he was reaching to undo his seatbelt or to rid himself of illegal drugs in his pocket.

The video merely shows that Ramirez was noncompliant with commands to keep his hands up. It does not establish what Ramirez was doing with his left hand when it was out of view and it is impossible to tell whether he was reaching for his waist or doing something else. However, the video does establish that Ramirez was not verbally aggressive toward Morrison. To the contrary, Morrison was arguably out of control in his commands, his language, and his aggressiveness. The video also depicts Morrison firing three rounds into a small sedan occupied by Ramirez and three innocent bystanders. Construed in the light most favorable to Plaintiffs, the video raises questions as to the reasonableness of Morrison's conduct. But in analyzing whether Ramirez's left hand posed an immediate threat to Morrison, the video does not allow a reasonable inference either way, so the Court must look to other evidence.

In their declarations, Crystal Jones claims she did not feel Ramirez moving in the seat behind her and Dustin Halverson, the driver, claims that from his

16

limited perspective Ramirez appeared to be trying to move the seatbelt. Defendants argue these statements are inconsistent with Jones and Halverson's testimony at the coroner's inquest. But at summary judgment, all facts are construed in favor of Plaintiffs without making credibility determinations. Accordingly, Jones and Halverson's statements that are most favorable to Plaintiffs control. These statements allow the inference that Ramirez's movement, though noncompliant, was nonthreatening.

Morrison is the only witness who saw what Ramirez was doing with his left hand. That puts this case within the Ninth Circuit's instructions to thoroughly examine the record for inconsistencies and circumstantial evidence that "would tend to discredit the police officer's story." *Scott*, 39 F.3d at 915; *see also Cruz*, 765 F.3d at 1079. Morrison explained in his affidavit that he "knew that persons who use methamphetamine tended to be aggressive, unpredictable and violent." (Doc. 23-1 at 2.) However, he has not indicated that he recognized Ramirez was under the influence of methamphetamine at the time of the shooting. Accordingly, Morrison's understanding of methamphetamine users as "aggressive, unpredictable and violent" is an after-the-fact justification that has no place in the reasonableness analysis here.

Next, Morrison's coroner's inquest testimony and affidavit are inconsistent as to when he recognized Ramirez. At the coroner's inquest, Morrison said he had

17

15 or 20 interactions with the Ramirez family, including one with Richard Ramirez. He described Ramirez as having a "fairly unique look to him. Kind of a longer face. Very easy to identify, especially after the one time that I can remember meeting him face-to-face." (Doc. 65-2 at 62.) Morrison testified he recognized Ramirez at the outset of the traffic stop: "I had an idea who it was when I got face-to-face with him. And just to verify, I asked him, 'What's your name?'" (*Id.* at 73.) Morrison's testimony that Ramirez was uniquely identifiable and that he immediately had an idea who Ramirez was is inconsistent with his affidavit that he "did not immediately recognize Richard Ramirez although the passenger in the right rear seat looked familiar to me." (Doc. 23-1 at 8.)

Further, though Plaintiffs have not disputed that Morrison was "advised to treat [Ramirez] as armed and dangerous" at the shift briefing on April 14, 2014, (Doc. 23-1 at 5; Doc. 29 at 6), the coroner's inquest testimony leaves open the warning's scope. For example, Officer Brewer testified Ramirez was named as a suspect in the Chavez shooting during the "Officer Caution" portion of the briefing. (Doc. 65-1 at 55.) But Brewer did not testify that Ramirez was described as "armed and dangerous." (See *id.* at 53–55.) Rather, Brewer testified there was "off-the-cuff talk about what had occurred." (*Id.* at 54.) Then, in response to questions about how officers approach suspects generally, Brewer testified they will treat a suspect "with the knowledge that we have and believe that he did it."

(*Id.*) The prosecutor followed up with a leading question, "And that he might be armed and dangerous," to which Brewer responded, "Absolutely." (*Id.*) There is a dispute, then, as to whether the Billings Police Department officially described Ramirez as armed and dangerous to Morrison or anybody else.

Finally, Ramirez's reputation for nonviolence, and Morrison's knowledge of that reputation, raises questions about whether he posed an immediate threat. At the coroner's inquest, Officer Tony Jensen testified about Ramirez that "typically, he would comply. I never had any issues where I had to get physical with him. I never typically had to necessarily raise my voice. In most occurrences, I got compliance with him when dealing with him." (Doc. 65-1 at 89.) Jensen explained Ramirez ran from him during a traffic stop a few weeks before Ramirez's death, but this is the only noncompliance Jensen recounts. (*Id.* at 91.) And, as discussed above, Morrison was surprised Ramirez was a suspect in a shooting and testified, "I've never known him to shoot somebody before." (Doc. 65-2 at 51.) The video, Morrison's conduct as shown and his inconsistencies in describing the incident, Halverson and Jones's declarations, and Ramirez's reputation for nonviolence raise factual questions, here construed in favor of Plaintiffs, as to whether there was ever a threat to Morrison.

### c.    Resisting arrest

As to the next consideration, resisting arrest or attempting to evade arrest by flight, Morrison argues Ramirez resisted by ignoring commands to keep his hands up. Plaintiffs respond there is no evidence that Ramirez tried to escape the car or that he used any force against Morrison. A suspect's failure to comply with commands goes to the resisting arrest factor, though Ramirez had committed no crime when the driver's car was parked and Morrison pulled in behind it. In *Smith v. City of Hemet*, a suspect ignored a command to remove his hands from his pocket. 394 F.3d 689, 693 (9th Cir. 2005) (en banc). He eventually complied, but then ignored two commands to put his hands on his head. *Id.* at 693–94. All this occurred before the officers decided to arrest him. *Id.* at 696–97. The officers used pepper spray, a police dog, and physical force to subdue the suspect. *Id.* at 694. In analyzing the excessive force claim, the court considered the suspect's failure to comply but concluded "it does not appear that [his] resistance was particularly bellicose or that he showed any signs of fleeing the area." *Id.* at 703. Because he refused to show his hands, officers did not know whether he had a weapon, but that went to whether the suspect posed an immediate threat, not whether he was resisting. *Id.* at 702.

Like the suspect in *Smith*, Ramirez partly failed to comply with commands to keep both hands on the seat in front of him. Also like in *Smith*, Ramirez never

directed any physical force toward Morrison or attempted to flee. He was not verbally aggressive, as revealed in the recordings. That Ramirez's "resistance" is more accurately described as "noncompliance" diminishes the importance of this factor in the *Graham* analysis. It is balanced against Morrison's revealed behavior and aggressiveness toward Ramirez and the other three passengers.

### d. Conclusion

After analyzing the *Graham* factors, a material dispute exists as to whether Ramirez posed an immediate threat to Morrison. And, while the issue is whether the use of force was objectively reasonable under the circumstances, Morrison is the only person, coupled with the video, who can establish the relevant circumstances. The accuracy of his account is relevant to the analysis. Given the inconsistencies regarding when Morrison recognized Ramirez and the scope of the warning that Ramirez was "armed and dangerous," Morrison's accuracy cannot be resolved at summary judgment. In light of the Ninth Circuit's instructions to meticulously review the record for factual disputes in deadly force cases and to grant summary judgment sparingly, the factual inconsistencies in Morrison's account and Ramirez's history of nonviolence are enough to preclude summary judgment on the issue of whether Morrison's use of deadly force against Ramirez was objectively reasonable.[3]

---

[3] Plaintiffs also rely on police practices expert Ernie Burwell's opinions to create a

## 2.   Clearly established law

Even if Morrison's use of deadly force was unconstitutional, he is entitled to qualified immunity if he did not violate clearly established law.  The Supreme Court has repeatedly warned courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted).  However, the Court has not provided any meaningful guidance on the appropriate level of specificity.  On one hand, the Court instructs that its "caselaw does not require a case directly on point for a right to be clearly established." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).  At the same time, it counsels that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).  But then, the Court suggests that the general rules in *Garner* and *Graham* suffice as clearly established law in "obvious cases." *Id.*  This leaves trial courts with the impossible task of bearding the lion by determining which facts from the

---

material dispute of fact as to the reasonableness of Morrison's use of deadly force. Generally, an expert opinion that an officer acted unreasonably is not enough to defeat summary judgment. *See City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015).  Here, the factual inconsistencies create a material dispute, even absent Burwell's report.  Accordingly, the Court need not consider the role of Burwell's opinions with respect to Morrison's motion for summary judgment.

fact-specific reasonable analysis are most important to the clearly established law inquiry.

Unsurprisingly, the parties here find no common ground on the appropriate level of specificity. At oral argument, Plaintiffs contended this is one of those "obvious cases" under *Graham* and *Garner*. And, it would be if the jury accepts their version of the facts that Ramirez's motions were non-threatening and rejects Morrison's account. Defendants, of course, would define the level of specificity to require a case in which the officer was aware the decedent was a suspect in a shooting the day before, the officer was familiar with the decedent's past, the decedent was noncompliant in following orders to keep his hands on the seat in front of him, and the decedent was moving his left hand out of sight.

The Court cannot determine whether Morrison violated clearly established law without knowing the facts of the case. Indeed, the Court cannot even determine the appropriate level of specificity to apply in the clearly established law inquiry without knowing the facts of the case. Accordingly, a ruling on whether Morrison is entitled to qualified immunity is reserved pending factual findings from the jury. *See, e.g., Smith*, 394 F.3d at 704 n.7 ("Whether the officers are entitled to qualified immunity may depend in large part on factual determinations the jury will be required to make."); *see also Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) ("[T]o the extent that a dispute of material fact precludes a

conclusive ruling on qualified immunity at the summary judgment stage, the

district court should submit factual questions to the jury and reserve for itself the

legal question of whether the defendant is entitled to qualified immunity on the

facts found by the jury.") Thus, neither prong of Plaintiffs' § 1983 claim against

Morrison can be resolved at summary judgment.

## C.    State claims

Morrison is entitled to summary judgment on the state law claims because

§ 2-9-305(5) of the Montana Code Annotated immunizes him from suit.  Section 2-

9-305(5) provides:

> Recovery against a governmental entity under the provisions of parts 1
> through 3 of this chapter constitutes a complete bar to any action or
> recovery of damages by the claimant, by reason of the same subject
> matter, against the employee whose negligence or wrongful act, error,
> omission, or other actionable conduct gave rise to the claim.  In an
> action against a governmental entity, the employee whose conduct gave
> rise to the suit is immune from liability by reasons of the same subject
> matter if the governmental entity acknowledges or is bound by a
> judicial determination that the conduct upon which the claim is brought
> arises out of the course and scope of the employee's employment,
> unless the claim constitutes an exclusion provided in subsections (6)(b)
> through (6)(d).

Relying on *Story v. City of Bozeman*, Plaintiffs argue § 2-9-305(5) only provides

immunity from liability and not immunity from suit. 856 P.2d 202 (Mont. 1993),

*overruled on other grounds by Arrowhead Sch. Dist. No. 75 v. Klyap*, 79 P.3d 250

(Mont. 2003).  *Story* did include language that nothing in § 2-9-305(5) barred suit

against the employee on the facts of the case.  *Id.* at 210.  However, the Montana

Supreme Court has since made clear that § 2-9-305(5) mitigates claims against individual employees for actions performed within the scope of their employment when a suit against the government entity arises out of the same subject matter. *Griffith v. Butte,* 244 P.3d 321, 335 (Mont. 2010) ("Section 2-9-305(5), MCA, serves as a complete bar to holding [employees] individually liable because it provides immunity from suit to individually-named defendants for actions performed within the course and scope of the official's employment."); *see also Kiely Construction, LLC v. City of Red Lodge,* 57 P.3d 836, 854–55 (Mont. 2002) (affirming summary judgment for individuals acting within the scope of employment when the suit against the city arose out of same subject matter).

Here, it is undisputed that Morrison was acting within the scope of his employment with the Billings Police Department at all relevant times. (Compl., Doc. 3 at ¶ 8; Ans., Doc. 5 at ¶ 8; Ans., Doc. 6 at ¶ 8.) Further, the subject matter of Plaintiffs' state law claims against Morrison also gives rise to their state law claims against the City of Billings. Accordingly, Morrison is entitled to immunity under § 2-9-305(5).

Plaintiffs argue a dispute exists as to whether Morrison acted with malice, which would bar the City of Billings from indemnifying him under § 2-9-305(6). Their argument seems to be that if Morrison acted maliciously such that the City of Billings will not indemnify him, then granting Morrison summary judgment means

they will not be able to recover for his allegedly malicious conduct. Plaintiffs'

argument rests on a flawed understanding of the interaction between § 2-9-305(5)

and § 2-9-305(6).

Section 2-9-305(6) sets forth four exceptions to the general rule that

government employees are entitled to *indemnity and defense* in suits arising out of

their on-the-job conduct. The exceptions are:

> (a) the conduct upon which the claim is based constitutes oppression, fraud, or malice or for any other reason does not arise out of the course and scope of the employee's employment;
>
> (b) the conduct of the employee constitutes a criminal offense as defined in Title 45, chapters 4 through 7;
>
> (c) the employee compromised or settled the claim without the consent of the government entity employer; or
>
> (d) the employee failed or refused to cooperate reasonably in the defense of the case.

§ 2-9-305(6). With respect to a government employee's *immunity* under § 2-9-

305(5), only exceptions (b) through (d) apply. Section 2-9-305(5) provides that

when the governmental entity "acknowledges . . . that the conduct upon which the

claim is brought arises out of the course and scope of the employee's

employment," the employee is entitled to immunity, *"unless the claim constitutes*

*an exclusion provided in subsections (6)(b) through (6)(d)."* § 2-9-305(5)

(emphasis added). Once the government "makes the requisite acknowledgment,

the exclusion set forth in subsection (6)(a) is inapplicable." *Peschel v. City of*

*Missoula*, No. CV 08–79–M, 2008 WL 5131369, at *10 (D. Mont. Dec. 5, 2008).

26

Thus, Morrison cannot be individually liable even if, as Plaintiffs argue, his conduct constituted malice.

This does not mean, however, that Plaintiffs are unable to recover for Morrison's allegedly malicious conduct. Rather, § 2-9-305(5) leaves the City of Billings on the hook for Morrison's conduct it acknowledges occurred within the course and scope of his employment, including malicious conduct. *See Kornec v. Mike Horse Mining & Milling Co.*, 180 P.2d 252, 256–57 (Mont. 1947) (explaining that malicious and intentional conduct can occur within the course of employment); *Rocky Mtns. Enters., Inc. v. Pierce Flooring*, 951 P.2d 1326, 1341 (Mont. 1997) (explaining that criminal conduct can occur within the course of employment). Even though Morrison is immune, "the governmental entity must pay any judgment for damages to the extent required by the law, even if the employee's conduct constituted oppression, fraud, or malice." *Peschel*, No. CV 08–79–M, 2008 WL 5131369, at *10.

### III.  City of Billings and Chief St. John's Motion for Summary Judgment

The City of Billings and Chief St. John have moved for summary judgment on all claims. Their motion is granted as to the § 1983 claim and the state negligent hiring and assault claim. The motion is denied as to the state vicarious liability claims.

## A. Chief St. John's capacity

As a preliminary matter, the parties disagree about whether St. John has been sued in his individual or official capacity. Individual, or personal, capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Official capacity suits are treated as actions against the government entity that the official represents. *Id.* If St. John has been sued in his individual capacity, then the issue is whether he personally violated Ramirez's constitutional rights, and the analysis will proceed along the lines of the claims against Morrison. If St. John has been sued in his official capacity, then the claims against him and the City are one and the same. Generally, the complaint specifies the capacity in which an official has been sued. When it does not, courts look to the "course of proceedings" to determine the nature of the suit. *Id.* at 167 n.14 (quoting *Brandon v. Holt*, 469 U.S. 464, 469 (1985)).

Here, though the Complaint lacks clarity, it is better read as naming St. John in his official capacity. The caption does not specify St. John's capacity. The Complaint's description of St. John says he "is sued in his individual capacity," but also alleges he is "a policy-making official for the [Billings Police Department] with the power to make official and final policy for it." (Doc. 3 at ¶ 9.) Describing St. John as a policymaking official is consistent with suing him in his official

capacity because a government entity is only liable under § 1983 when its policies, including certain decisions made by policymakers, cause a constitutional violation. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Further, the Complaint never alleges any conduct by St. John that would render him liable in his personal capacity. Rather, it always refers to "Defendants City and St. John" together, as if they are one entity.

Finally, the counts in the Complaint make clear that St. John has been sued in his official capacity. Count 1 is a § 1983 claim against Officer Morrison and various John Doe defendants. Count 2 is described as a "*MONELL CLAIM*" against St. John and the City. (Doc. 3 at 13.) *Monell v. Department of Social Services* is the Supreme Court case authorizing § 1983 suits against municipalities. 436 U.S. 658, 694 (1978). That St. John is named as a defendant only to the *Monell* claim shows an intent to sue him only in his official capacity. Accordingly, the claims against St. John and the City are indistinguishable.

### B. Section 1983 claims

A municipality is liable under § 1983 for constitutional violations that occur pursuant to its policy, custom, or practice. *Id.* "Policy" encompasses more than a municipality's written rules. For example, the failure to train employees can form the basis for *Monell* liability when it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v.*

29

*Harris*, 489 U.S. 378, 388 (1989). Further, the action of a single policymaking

official can form the basis of liability when the official has final decision-making

authority. *Pembaur*, 475 U.S. at 480. Similarly, a policymaker's ratification of a

subordinate's decision can form the basis of liability when the ratification is a final

decision. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Regardless of

the theory on which liability is premised, the plaintiff must show the policy was the

direct and proximate cause of the constitutional violation. *See Gravelet-Blondin v.

Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). A municipality cannot be liable

under § 1983 on the theory of respondeat superior. *Monell*, 436 U.S. at 691.

Here, Plaintiffs allege the City and St. John are liable on a (1) policy and

custom theory, (2) failure to train theory, and (3) ratification theory. The City and

St. John are entitled to summary judgment because Plaintiffs have failed to

establish *Monell* liability on any of these theories.

### 1.    Policy and custom

To establish *Monell* liability on a policy and custom theory, Plaintiffs must

show "a direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." *Castro v. Cty. of L.A.*, 833 F.3d 1030, 1075 (9th Cir.

2016) (en banc) (quoting *City of Canton*, 489 U.S. at 385). They must also

demonstrate the policy or custom reflected "deliberate indifference" to

constitutional rights. *Id.* at 1076. A custom, as opposed to a formal policy, must

"be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, Plaintiffs allege the City's Code of Ethics (Policy 2-1), Use of Force Policy (Policy 3-1), and Traffic Law Enforcement Policy (Policy 5-1) caused a violation of Ramirez's constitutional rights. Their brief merely asserts the City promulgated policies that caused the constitutional violations. At oral argument, they argued if Morrison is determined to have violated Ramirez's Fourth Amendment rights, and Morrison followed the City's policies, then those policies caused the constitutional violation. This type of post-hoc reasoning does not establish *Monell* liability. *Monell* asks whether a policy itself caused a constitutional violation, not whether an officer's unconstitutional conduct happened to fall within the policy. Plaintiffs have not shown how the cited policies caused a constitutional violation.[4] Nor have they shown the policies amount to "deliberate indifference" to constitutional rights. Plaintiffs have failed to produce sufficient evidence to establish an essential element of *Monell* liability on a policy and custom theory.

_____

[4] Plaintiffs claim that the written policy may be unconstitutional as-applied, citing *Lanier v. City of Woodburn*, 518 F.3d 1147 (9th Cir. 2008). *Lanier* involved an employee's challenge to a city's policy to drug test applicants as a condition of employment. *Id.* at 1148. It was not a § 1983 claim and did not involve *Monell* liability.

## 2. Failure to train

To establish *Monell* liability on a failure to train theory, Plaintiffs must show "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Deliberate indifference means "that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks omitted). Generally, to prove deliberate indifference requires showing a "pattern of similar constitutional violations by untrained employees." *Id.*

Here, Plaintiffs' only evidence of the City and St. John's failure to train employees is that Morrison was unable to identify which constitutional amendment governed the use of force. But even if Morrison himself lacked training, Plaintiffs have not shown that the City displayed deliberate indifference to constitutional rights in its training programs. They have not provided any evidence about the City's training programs, nor have they shown that Billings police officers have engaged in a pattern of constitutional violations. Plaintiffs have thus failed to establish an essential element of *Monell* liability on a failure to train theory.

## 3. Ratification

To establish *Monell* liability on a ratification theory, Plaintiffs must show that "a policymaker approve[d] a subordinate's decision *and the basis for it*."

*Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Ratification must be an affirmative act. *Id.* "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

Here, Plaintiffs argue St. John ratified Morrison's allegedly unconstitutional conduct by "turning a blind eye." (Doc. 59 at 21.) However, the failure to discipline an officer does not by itself establish ratification. *See Lytle*, 382 F.3d at 987; *see also Hermosillo v. Cty. of San Bernadino*, No. EDCV-15-00033, 2016 WL 10566648, at *12 (C.D. Cal. Dec. 22, 2016) (collecting cases). Plaintiffs also assert St. John's alleged failure to investigate use of force incidents amounts to ratification. If true, the failure to investigate might be the something more that would transform a lack of discipline into ratification. But Plaintiffs have not made such a showing here. Instead, they rely on their expert Burwell's opinion that the Billings Police Department's investigative procedures were flawed. However, Burwell has not reviewed the Department's investigative procedures or disciplinary records, and Plaintiffs have provided no evidence of the failure to investigate beyond Burwell's bare assertion. Like with the other theories of *Monell* liability, Plaintiffs have failed to establish liability on a ratification theory. The City and St. John are entitled to summary judgment on the *Monell* claims.

### C.    State claims

Plaintiffs claim the City and St. John are vicariously liable for Morrison's tortious conduct on a theory of vicarious liability. They also claim the City and St. John are directly liable for their own negligent hiring and retention of Morrison. The City and St. John are entitled to summary judgment on the negligent hiring and retention claim, but not on the vicarious liability claims.

### 1.    Vicarious liability

An employer is liable for torts committed by employees within the scope of their employment. *Maguire v. Montana*, 835 P.2d 755, 758 (Mont. 1992). Plaintiffs allege Morrison acted negligently and that he assaulted Ramirez. The parties agree Morrison was acting within the scope of his employment at all relevant times. The City is liable, then, for Morrison's allegedly tortious conduct.

However, "a public officer acting under authority of law and without malice is not liable for assault and battery provided he uses no more force than is reasonably necessary under the circumstance to properly perform his official duties." *Luciano v. Ren*, 589 P.2d 1005, 1008 (Mont. 1979) (internal quotation marks omitted). Morrison is immune from, and the City is not vicariously liable for, the assault claim if he acted without malice and his use of force was reasonably necessary to perform his duties as a police officer. As discussed above, Plaintiffs argue Morrison acted maliciously and a material dispute of fact exists as

34

to whether Morrison's use of force was reasonable, precluding summary judgment on the City's vicarious liability for the assault claim.

With respect to Morrison's alleged negligence, the City and St. John argue Morrison was not negligent, and therefore they are not vicariously liable, as a matter of law. They incorporate Morrison's arguments by reference. But Morrison asserted statutory immunity to the state law claims and did not present any arguments on the merits.

The elements of a negligence claim are (1) a legal duty on the part of the defendant, (2) breach of the duty, (3) causation, and (4) damages. *Gonzales v. City of Bozeman*, 217 P.3d 487, 491 (Mont. 2009). The existence of a duty, and the appropriate standard of care, is a matter of law. *Id.* Montana courts have not addressed whether the standard of care in negligent use of force cases corresponds with the Fourth Amendment reasonableness inquiry. Plaintiffs argue Burwell established the appropriate standard of care as "the best practices that are established by another reasonable officer with the same type of training." (Doc. 59 at 26.) Plaintiffs rely on the same analysis to establish that Morrison acted unreasonably under the Fourth Amendment and that he acted negligently under state law. Plaintiffs, then, apply the same standard to the Fourth Amendment and negligence claims. *See Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1209 (E.D. Cal. 2008) (analyzing a negligence claim premised on deadly force according to

the Fourth Amendment's reasonableness standard). Accordingly, if Morrison's use of force was reasonable under the Fourth Amendment, then he was not negligent under state law according to the Plaintiffs' proposed legal standard, and the City and St. John would be entitled to summary judgment on the theory of vicarious liability. But again, a material dispute exists as to whether Morrison acted reasonably, which precludes summary judgment on the City's vicarious liability.

### 2. Negligent hiring and retention

Montana recognizes tort claims against employers for negligently hiring, supervising, or retaining an unfit employee. *See Maguire*, 835 P.2d at 760. The tort concerns the employer's own negligence in hiring or retaining an employee who a reasonable employer would know is unfit and creates an unreasonable risk of harm to others. *Bruner v. Yellowstone Cty.*, 900 P.2d 901, 906 (Mont. 1995) (Leaphart, J., dissenting). The employer's negligence must be the proximate cause of the plaintiff's injuries. *Peschel v. City of Missoula*, 664 F. Supp. 2d 1149, 1169 (D. Mont. 2009).

Here, Plaintiffs fail to establish the elements of a negligent hiring or retention claim. They rely exclusively on Burwell's opinions, which do not point to particular facts like disciplinary records or policy violations to show the City and St. John breached a standard of care. Accordingly, the City and St. John are entitled to summary judgment on the negligent hiring and retention claim.

36

### 3. Assault

Plaintiffs pled an assault claim against all defendants, but the allegations only relate to Morrison's conduct. The City and St. John argue, and Plaintiffs do not contest, that without allegations or evidence they committed an assault, the assault claim against them fails. Accordingly, the City and St. John are entitled to summary judgment on the assault claim to the extent it purports to hold them directly liable for the alleged assault. The City is still vicariously liable for any assault committed by Morrison.

### CONCLUSION

Accordingly, IT IS ORDERED that Officer Morrison's motion for summary judgment (Doc. 21) is DENIED in part, RESERVED in part, and GRANTED in part as follows:

a. Morrison's motion for summary judgment that the traffic stop was constitutional is DENIED as MOOT.

b. Morrison's motion for summary judgment on the § 1983 claim (Count 1) is DENIED as to whether his use of deadly force was constitutional and RESERVED as to whether he did not violate clearly established law.

c. Morrison's motion for summary judgment with respect to his individual liability on the state law claims (Counts 3, 4, 5, and 6) is GRANTED.

IT IS FURTHER ORDERED that the City of Billings and Chief St. John's

motion for summary judgment (Doc. 45) is DENIED in part and GRANTED in part as follows:

a.  The City and St. John's motion for summary judgment on the *Monell* claim (Count 2) is GRANTED.

b.  The City and St. John's motion for summary judgment on the state negligence claim (Count 3) is GRANTED as to the negligent hiring and retention claim and DENIED as to the vicarious liability claim.

c.  The City and St. John's motion for summary judgment on the state law wrongful death and survivorship claims (Counts 4 and 5) is DENIED.

d.  The City and St. John's motion for summary judgment on the state assault claim (Count 6) is GRANTED as to the direct liability claim and DENIED as to the vicarious liability claim.

DATED this 30 day of January, 2019.

Donald W. Molloy, District Judge
United States District Court